**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| RICKY EDWARD CRUZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-CV-1321-MAB |
| | ) | |
| LORIE CUNNINGHAM,[1] MARK | ) | |
| MCFARLAND, TREVOR GOODRUM, | ) | |
| JAMES HANSON, FAIYAZ AHMED, | ) | |
| JOHN MCGRATH, LEIF MCCARTHY, | ) | |
| AND NOLAN THOMPSON, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM AND ORDER</u>

BEATTY, Magistrate Judge:

This matter is before the Court on the motions for summary judgment filed by

Defendant Mark McFarland (Doc. 158), Defendants Lorie Cunningham, Trevor

Goodrum, James Hanson, John McGrath, Leif McCarthy, and Nolan Thompson (Doc.

160), and Defendant Dr. Faiyaz Ahmed (Doc. 162). For the reasons explained below,

summary judgment is granted in favor of Defendants McFarland, Hanson, and Ahmed.

Summary judgment is denied as to Defendants Cunningham, Goodrum, McGrath,

McCarthy, and Thompson.

<u>BACKGROUND</u>

Plaintiff Ricky Cruz is a prisoner under the care of the Illinois Department of

---

[1] The docket sheet refers to Defendant Cunningham as "Laura Cunningham." However, filings indicate the correct spelling of Defendant Cunningham's name is "Lorie." The Clerk of Court is DIRECTED to update the docket sheet to reflect that the true and correct name of Defendant "Laura Cunningham" is "Lorie Cunningham."

Corrections who brings this civil rights actions under 28 U.S.C. § 1983. Plaintiff filed his Second Amended Complaint on November 16, 2018 (Doc. 27). Plaintiff alleges he received unconstitutionally inadequate medical care after he sustained an injury to his leg (*Id.*).

The Court performed a merits review of the Second Amended Complaint pursuant to 28 U.S.C. § 1915A and permitted Plaintiff to proceed on the following count:

**Count 1:**     Eighth and/or Fourteenth Amendment claim against Nolan Thompson, Faiyaz Ahmed, Mark McFarland, Laura Cuningham, John McGrath, Trevor Goodrum, James Hanson, and Leif McCarthy for delaying or denying Plaintiff medical care for the right shin injury he sustained at Lawrence on or around June 16, 2017.

(Doc. 29).

## UNDISPUTED MATERIAL FACTS

The following materials facts are not genuinely disputed. Plaintiff was housed at Lawrence Correctional Facility ("Lawrence") from January 2017 through March 2019 (Doc. 167-1, p. 1). On June 16, 2017, Plaintiff sustained an injury to his right leg and pressed the emergency call button in his cell (Doc. 167-2, p. 8) (Doc. 163-3) (Doc. 167-4, p. 96-98 & 169). Plaintiff testified a correctional officer responded and indicated he would contact medical professionals (Doc. 167-4, p. 98 & 171-72).

Plaintiff attempted to notify other inmates to press their emergency call buttons and was yelling (*Id.* at p. 175). He testified he was "in a lot of pain" and "losing a lot of blood" (*Id.*). Another inmate, Gilbert Mojena, heard Plaintiff's pleas (Doc. 167-5). Plaintiff was not seen in the Health Care Unit ("HCU") on June 16, 2017 (*Id.* at p. 98-99).

During the relevant times, protocol at Lawrence required correctional officers on

the Housing Unit wings to perform "checks" every 30 minutes and record the checks in a log (Doc. 167-6, p. 11). Defendant Thompson was the officer on duty on the A wing in R8 on June 16, 2017, during the 3:00 p.m. to 11:00 p.m. shift (Doc. 167-3, p. 3). The wing log for June 16, 2017 indicates the R8 A wing was checked and marked secure at 8:50 p.m., 9:19 p.m., 9:48 p.m., 10:15 p.m., 10:30 p.m., and 10:34 p.m. (Doc. 167-7).

Plaintiff did not speak to any correctional officers or medical staff who were working the third shift (the overnight shift) between 11:00 p.m. on June 16, 2017 and 7:00 a.m. on June 17, 2017 (Doc. 161-1, p. 45). Plaintiff wrapped his leg to keep it from bleeding and fell asleep (*Id.*).

### A. Plaintiff's Medical Treatment

On June 17, 2017 at 9:40 p.m., approximately 24 hours after he sustained the cut to his right leg, Plaintiff was seen in the HCU (Doc. 167-2, p. 8-9). Plaintiff's cut was approximately one to one-and-a-half inches long and one-half inch wide (*Id.* at p. 9). The nurse noted no bleeding or drainage but noted swelling (Doc. 163-6, p. 2-3). The nurse cleaned the wound, applied triple antibiotic ointment, and applied a bandage (*Id.*). While Plaintiff was in the HCU, Dr. Vipin Shah was notified by telephone of Plaintiff's injuries and directed Plaintiff to see a physician on June 19, 2017 (*Id.* at p. 3 & 34). Dr. Shah instructed that the wound not be sutured or stitched because of the time frame of the injury (*Id.*). Defendant Ahmed testified that if more than six hours passes between a wound occurring and receiving medical treatment, it is generally too late to stitch or suture a wound (Doc. 163-2, p. 23-24, 39-40, & 41).

Plaintiff alleges he saw Defendant Cunningham on June 17, 2017, but did not see

her in person any time after this date (Doc. 161-1, p. 17). However, Plaintiff's medical records do not show Plaintiff saw Defendant Cunningham for any medical treatment related to his leg wound (Doc. 161-2, p. 6-28).

On June 18, 2017, a licensed practical nurse ("LPN") cleaned Plaintiff's wound, changed his dressings, and noted the laceration was red with moderate pus (Doc. 167-2, p. 7). The LPN recorded that Plaintiff was provided bandages and triple antibiotic ointment (*Id.*).

On June 19, 2018, Defendant Ahmed treated Plaintiff and prescribed him a course of treatment to be administered by Lawrence's nursing staff, which included antibiotics and daily dressing changes (*Id.* at p. 10). Defendant Ahmed observed serosanguinous discharge from the wound and ordered a culture (*Id.* at p. 10 & 114).

For the following seven weeks, from June 19 to August 2, 2017, Plaintiff saw nursing staff at Lawrence (*Id.* at p. 10-28). On June 21, 2017, an LPN changed Plaintiff's dressings, cleaned the wound, and noted a small amount of drainage (*Id.* at p. 10). On June 23, 2017, an RN performed a dressing change and charted there was drainage on the old dressings but the margins were clean (*Id.* at p. 11). Also on June 23, 2017, Defendant Ahmed reviewed the lab results of Plaintiff's wound culture from June 19 and the culture was negative for infection (*Id.* at p. 119). On June 24, 2017, an LPN performed a dressing change and noted there was a small amount of dark red drainage on the old dressing and that the wound's margins were clean and pink (*Id.* at p. 11). On June 25 and June 28, an LPN performed dressing changes on Plaintiff's leg wound (*Id.* at p. 12).

Plaintiff recalls his wound was getting better around June 23, 2017 (Doc. 161-1, p.

21). On July 2, 2017, an LPN performed a dressing change and noted the wound was tender, open, and there was a small amount of drainage (Doc. 167-2, p. 12). When the LPN performed the dressing change on July 2, the LPN noted the Plaintiff was to be put on the M.D. line for the next available date for reevaluation with a doctor (*Id.*). On July 6, 2017, an LPN performed a dressing change on Plaintiff's right leg and noted the area was healing (*Id.* at p. 13). On July 7, 2017, an LPN performed a dressing change and observed the wound had clean pink skin and good borders (*Id.* at p. 14). On July 12, 2017, an LPN performed a dressing change on Plaintiff's right leg wound and noted the area was healing and there were no signs or symptoms of infection (*Id.* at p. 15) (Doc. 163-1, p. 120-21). Plaintiff recalled his wound was getting better around June 30, 2017 to July 12, 2017 (Doc. 161-1, p. 21 & 31-32).

On July 14, 2017, Plaintiff saw Defendant Ahmed, who noted the area was tender but healing (Doc. 163-2, p. 71-73) (Doc. 167-2, p. 18). Dr. Ahmed ordered triple antibiotic ointment and Band-Aids be applied to the wound daily for two weeks and Plaintiff was issued triple antibiotic ointment and Band-Aids (Doc. 163-2, p. 44-45) (Doc. 167-2, p. 114). On July 18, 2017, an LPN examined Plaintiff's leg and observed that one inch of the area was open and there were no signs or symptoms of infection (Doc. 167-2, p. 19). The LPN educated Plaintiff to continue with the treatment and issued him supplies; the LPN noted that Plaintiff understood (Doc. 163-5, p. 39-40) (Doc. 167-2, p. 19).

Plaintiff testified he was instructed to rinse the wound with water, apply ointment, and apply a bandage (Doc. 161-1, p. 18). However, Plaintiff testified he tried to keep water from getting into the wound while in the shower and would leave a bandage on during

showers (*Id*. at p. 19).

On July 24, 2017, Plaintiff presented to nurse sick call and reported his right leg wound was severely hurting and he had chills (Doc. 167-2, p. 21-22). The medical record indicates that Plaintiff reported he was keeping the wound clean and applying antibiotic ointment, as ordered (*Id*. at p. 22). The nurse recorded that Plaintiff's wound was swollen with slightly dark edges and redness surrounding the tissue (*Id*.). Plaintiff reported that he had been keeping his wound clean and applying the ointment as ordered (*Id*.). A physician on site prescribed the antibiotic Augmentin and prescribed ibuprofen for his leg and another medical issue (Doc. 163-2, p. 73-76) (Doc. 167-2, p. 22).

On July 26, 2017, a nurse entered a medical note in Plaintiff's medical records, which indicated Defendant Hanson stopped the nurse while she was conducting a medical line and asked her to see Plaintiff about his leg wound (Doc. 167-2, p. 23). The note stated Plaintiff was already scheduled to see a medical provider the next day, July 27, 2017 (*Id*.).

On July 27, 2017, Plaintiff saw Defendant Ahmed, who noted Plaintiff's wound was tender with redness and no discharge (Doc. 167-2, p. 24). Defendant Ahmed assessed Plaintiff with a right leg laceration with cellulitis (*Id*.). Defendant Ahmed discontinued the Augment, prescribed Plaintiff Clindamycin, which is used to treat Methicillin-Resistant Staphylococcus Aureus ("MRSA"), ordered a culture and blood laboratory tests, and ordered a dressing change every day by a nurse (Doc. 167-2, p. 24-25, 115, & 120-22). On July 28, 2017, Plaintiff's blood was drawn for the labs ordered by Defendant Ahmed and an RN performed a dressing change (Doc. 167-3, p. 120-22).

On July 30, 2017, the HCU received the results of Plaintiff's culture, which indicated Plaintiff had MRSA, but the MRSA was susceptible to the antibiotic Clindamycin (Doc. 167-2, p. 26-27 & 120-21). An RN advised Dr. Shah of the culture results and medication susceptibility received that day and Plaintiff's current prescriptions; Dr. Shah gave no new orders (Doc. 167-2, p. 27). Also on July 30, 2021, an RN performed a dressing change (*Id.* at p. 26-27).

Nothing in Plaintiff's medical records show he was infected with MRSA due to the medical treatment he received for his leg wound (Doc. 161-1, p. 54). On August 2, 2017, Plaintiff saw Defendant Ahmed, who examined Plaintiff's wound and reviewed the culture and lab results (Doc. 163-2, p. 58-59) (Doc. 167-2, p. 28). Defendant Ahmed observed Plaintiff's wound was healing, there was granulation, and there was no redness or discharge (Doc. 163-2, p. 58-59) (Doc. 167-2, p. 28). Defendant Ahmed discontinued the Clindamycin because the leg was healing, there were no signs of infection, and he wanted Plaintiff to avoid side effects from the antibiotic (Doc. 163-2, p. 58-60) (Doc. 167-2, p. 28).

The dressings on Plaintiff's right leg were changed on August 5, 6, 7, 8, 10, 11, 12, 13, & 14 (Doc. 167-2, p. 91). The laceration and infection healed after the treatments in August 2017 (Doc. 163-1, p. 138-39) (Doc. 167-2, p. 91).

To Defendant Ahmed's knowledge, nurses were following his orders through the treatment of Plaintiff's leg wound (Doc. 163-2, p. 82-83).

When an inmate is placed on the med line, a nurse schedules the appointment with the physician and the physicians do not schedule when a patient is seen by a nurse or

physician (Doc. 163-2, p. 78) (Doc. 163-5, p. 36). When a physician sets up a treatment plan, the nurses are required to follow that treatment plan when it is in the scope of their practice (Doc. 163-5, p. 31). The nurse who is assigned to the housing unit has the responsibility to make sure the nurses are following the doctor's treatment plans for the inmates in that unit, such as changing the dressings of an inmate in that housing unit (Doc. 163-5, p. 31-32).

### B. Plaintiff's Grievances

On July 1, 2017, Plaintiff filed a grievance that states:

Due to my personal injury to my right leg that took place from a slip and fall from top bunk sli[p]ping off of in location R8 AL15 now this taking place I have a deep cut. Deep enough to see the muscle in my leg this slip was from the sink and I was seen from the Doctor Ahmed. And told me M30089 that I could not receive [stitches] to close the wound on 6.17.17 because of it being to[o] late. And this was an order from Laura [Cunningham] that this wound could not be stitched. Now this being said directions an[d] orders from the Doctor after being seen on 6.17.17 was that I be seen every day to monitor the wound. To be cleaned an[d] bandage [until the] wound started to get better on 6.30.17 Ms. Gates that passed out medication on 2nd shift was the only one to help me with at that time with adhesive bandages to keep this cut from getting infected[.] [N]ow this being said on 7.1.17 not one of the nurses on 1st shift came to tend to this wound. This wound is not healing in a healthy way[.] [It's] getting infected and when they do see me they try to steril[ize] the wound with just water. I keep putting in for medical for treatment on other treatment that I want to have taken care of while I put in request after request and still I wait patient and do not get called to see the doctor. Now this being said on 1st shift from 6.18.17 I was seen from nurses to tend the wound 6 25 17 6 26 17 6 28 17 6 29 17 6 30 17 Ms. Gates and officer Simpson was the ones I had to call on to help me with this wound I spoke to officer Pieper today on 7.1.17 and he called over there to medical to find out what has [taken] place and see if they [could] send someone over to see me about this cut[.] I even told Mr. McCaslin and he told me on 1st shift to talk to 1st shift officer on 7.1.17 Kurkwood and he even called over to medical to find out what was taking place and still nothing took place. Now when R/O Piper came with nurse on medication line on 2d shift on 7.1.17 the nurse [once] again made [sure]

> I had a bandage to keep wound closed if it was not for me reaching out to officer Piper and officer Piper making [sure] I had something to keep this wound closed off so it [would] not get infected even more [than] it is. I don't know what I would do[.] This large cut is still open and is not healing at all or get[t]ing any better from [inadequate medical attention[.] this was an emergency at [the] time because my leg was very badly infected and staff here at Lawrence was doing nothing about it.

(Doc. 167-9, p. 4-5).

The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 4). A grievance counselor responded on August 8, 2017 and stated, "addressed by 7-10-17 grievance" (*Id.* at p. 5)

On July 2, 2017, Plaintiff filed another grievance that states, in part:

> On date 7 2 17 I was seen by Nurse Shriver and another that told me she's not taking care of that to officer. Nurse Shriver came looked at the wound gave me a bandage. Looked at the wound did not clean it put some antib[i]otic ointment on a bandage and then placed it on the wound[.] It seems to me that since [I] put in request for my other situation th[ese] nurses are not trying to help me with [either] or because the request.

(*Id.* at p. 6).

The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.*). A grievance counselor responded on August 8, 2017 and stated, "addressed by 7-10-17 grievance" (*Id.*).

On July 3, 2017, Plaintiff failed a grievance that states, in part:

> On 7 3 17 Again I was not seen for a nurse check up on the wound on my leg – right leg to keep clean. I have been asking doctors through request to be seen let[t]ing officers I need to be t[ak]en care of all I needed was it to be cleaned and bandaged and today they did not do anything. This was the doctor's orders and every other day I have to let officer simpson know that I need a bandage to at least keep it from get[t]ing infected. I'm also let[t]ing officer Simpson know today on 7 4 17 that the nurse has not seen me again for this treatment. And I asked officer Simpson on[ce] again that I needed

for this deep cut to be cleaned. I [illegible] bandages to cover the wound.. .

(Doc. 161-3, p. 85).

The grievance indicates it was received by the Administrative Review Board ("ARB"), which responded that the grievance was misdirected because medical issues must be reviewed at the facility prior to review by the ARB (*Id.* at p. 84).

On July 10, 2017, Plaintiff file a grievance that states:

> On July 8th as I was coming back from the yard Lt McCarthy was told from I/M M30089 that I M30089 had on my right leg that was open and not bandaged because I had nothing to bandage this wound with. Because of nurses not seeing if it was bandage[d]. Now this being said this wound has been open since the 17th of June really the 16th so this being said I asked Lt McCarthy if he could phone H.C.U. for this purpose of my wound[.] [H]e told me as I was showing him my wound that he would call over there now as I'm showing him my wound. I sa[id] to Lt McCarthy why is this wound turning green[.] [H]e told me its because its getting better and that means that its healing for some reason. I did not believe so and I don't understand why it was such a big problem for nurse with a order form the doctor to treat this wound and monitor it [u]ntil it has gotten better[.] Ever since this slip and fall from top bunk off the sink that split my right leg open has let me a nasty scar[] and will be like that now for the rest of my life[.] Now I'm having problems walking on my right leg[.] Ive be[e]n scheduled to see the doctor and still nothing. I even been putting in request slips about this to see the doctor.

(Doc. 167-9, p. 2-3). The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 2). On July 17, a grievance counselor responded, "Per HCU as documented in medical chart Offender Cruz is being seen and treated by a licensed Illinois physician within community standards of care" (*Id.*).

Plaintiff filed another grievance on August 15, 2017, which states:

> On 6.16.17 I/M M30089 has slip[p]ed off of top bunk off the sink split[t]ing right leg open on shin opening my leg about 4 inch in size on win A,8,L15. Now this being said, on 6 17 17 – 6, 19, 17, 6, 21, 17 – 6, 23, 17 – 6, 24, 17 6,

25, 17 – 6, 28, 17 I had a[n] infection starting in right leg because of inadequate medical attention from doctor ahmed's orders to clean wound properly and bandage wound properly but nurs[e]s failed to do so on these dates giving me one bandage at on dates telling me to wash with water and my soap[.] [T]hey told me the same thing on dates 7, 2, 17 7, 16, 17 7, 7, 17 was the last they seen me kept telling me it was get[t]ing better and not paying attention to doctor[s] orders, as I kept on R/O [illegible] seeing that nurs[e]s paid attention to this wound it took all the way to the date 7, 23, 17 that my right leg had got real bad with a[] staff infection from staff in Lawrence not car[]ing when I/M Ricky Cruz kept alerting officers nurs[es] director of nurs[e]s Laura Cunni[n]gham Mark Mcfarland that run medical. I even let the warden know about it warden Lamb. The staff here took so much time to get on to what needed to be done that I had got very sick and had a very bad infection in my leg that the doctor had to give me antibiotic Clindamyein to try to take the swollen down and infection away first doctor ahmed put me on [Amoxicillin]…and Ibuprofen…for pain [be]cause the infection was causing me so much pain I could[n't] walk caus[ing] me to have a temperature of 97 on 7/23/17 because of inadequate medical attention[.] [E]very time I told Officers Goodrum R/O McGrath R/O Johnson R/O Imboeen and Lts that work 8-B they told me after seeing this bad infection that they would phone[] medical and it took all the way for medical doctor Ahmed to properly wrap an clean the infected wound on 7,28,17 after [already] being infected with [illegible] also I had to walk on swollen painful right leg from dates to an[d] from chow and medical after staff seeing what they seen my leg is still seriously infected because of medical staff not doing the[i]r jobs. None of these officers or staff here at Lawrence [were] concerned when this infection had started to take affect[.] this infection has caused affliction to my person[.] I let staff here know so many times [u]ntil it came to these proven facts of lack of medical nurses not taking care of wound by doctor[']s orders. This is a proven fact [be]cause if it was not I [would] have been fine with no infection.

(Doc. 161-3, p. 70-71).

The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 70). A grievance counselor responded to the grievance on August 18 and wrote, "Per HCUA, Ms. Cunningham, 'As documented in medical chart, Offender Cruz being seen and treated by licensed Illinois physician within community standards of care.'" (*Id.* at p. 69). Plaintiff appealed the grievance to the ARB and the ARB emailed Defendant

Cunningham about Plaintiff's treatment on November 6, 2017 (*Id.* at p. 68). Defendant Cunningham responded on November 7, 2017 with a summary of Plaintiff's medical care (*Id.* at p. 67-68). The summary states Plaintiff was treated by either a nurse or a physician on June 17, June 18, June 19, June 21, June 22, June 24, June 25, June 28, July 2, July 6, July 7, July 12, July 13, July 14, July 18, July 24, July 26, July 27, July 28, July 29, July 30, July 31, August 2, August 5, August 6, August 7, August 8, August 10, August 11, August 12, August 13, and August 14 (*Id.*). The summary also states that on August 15, the right leg wound healed (*Id.* at p. 67).

### C.  Defendants' Job Duties

Defendant McFarland was the Director of Nursing who was in charge of Lawrence's nursing staff during June, July, and August, 2017 (Doc. 167-10, p. 5). Defendant McFarland did not provide any treatment to Plaintiff (Doc. 163-1, p. 65). The Director of Nursing at a correctional center does not provide direct care to inmate patients (Doc. 167-10, p. 5). Medical personnel that provide direct treatment of inmate patients are part of a union, and it would be against union rules for a Director of Nursing to provide any direct patient care (*Id.* at p. 17). Defendant McFarland's position as Director of Nursing is a non-union position (*Id.*). The role of the Director of Nursing is more of a site manager and Defendant McFarland was in charge of coordinating staffing and scheduling the medical unit (*Id.*). A physician prepares the treatment plans for lacerations, not the Director of Nursing (*Id.* at p. 18). Defendant McFarland would not have been involved in Plaintiff's treatment unless a complaint was made about his treatment after the doctor and nurses had provided treatment (Doc. 159-3, p. 17-18).

Defendant Ahmed testified he did not speak with Defendant McFarland about Plaintiff's treatment because treatment was going well (*Id.*).

During the relevant timeframe, Defendant Cunningham was the HCU Administrator who reviewed and responded to inmate grievances related to medical needs (Doc. 167-11, p. 12-15). Plaintiff testified he sent letters to Defendant Cunningham about "what was going on with Medical" (Doc. 163-1, p. 183). Plaintiff's medical records do not contain copies of any letters sent to Defendant Cunningham related to Plaintiff's medical treatment (Doc. 161-2). Plaintiff states Defendant Cunningham never provided him direct medical treatment (Doc. 163-1 p. 185). Plaintiff stated he does not know if Defendant Cunningham was consulted regarding his grievances or ever saw a copy of those grievances (Doc. 161-1, p. 184-85). Plaintiff testified his claim against Defendant Cunningham is based on the fact that she "runs medical" (Doc. 161-1, p. 182-83). Defendant Cunningham is not licensed to provide a plan of care for an offender, because she was a nurse serving in an administrative role in 2017 (Doc. 161-4, p. 8 & 15).

During the relevant times, Defendant Goodrum was a correctional officer at Lawrence (Doc. 161-1, p. 48) (Doc. 161-5, p. 3-4). Plaintiff alleges he told Defendant Goodrum he was unsatisfied with his medical treatment and Defendant Goodrum did not fix the issue (Doc. 161-1, p. 48). Plaintiff testified he spoke to Defendant Goodrum about his medical issues "a few" times (Doc. 161-1, p. 48). Plaintiff stated he does not know if Defendant Goodrum has any medical training (*Id.*). Defendant Goodrum testified he relays medical complaints he receives from individuals in custody to the health care unit and takes direction on how to act from the medical professionals (Doc. 161-5, p. 13-

14).

During the relevant times, Defendant Hanson was a correctional sergeant at Lawrence (Doc. 161-1, p. 48) (Doc. 161-6, p. 3). Plaintiff alleges Defendant Hanson was not respectful enough to Plaintiff when Plaintiff complained about his medical treatment (Doc. 161-1, p. 49). Plaintiff did not make any complaints about his leg to Defendant Hanson until he believed his leg was getting infected, around the end of July 2017 (*Id.* at p. 49-49). Plaintiff received medical treatment approximately ten to fifteen minutes after speaking to Defendant Hanson about his medical issues (*Id.*). Plaintiff spoke to Defendant Hanson two times regarding his medical treatment (*Id.* at p. 49) Both conversations occurred on the same day (*Id.*). Plaintiff received additional medical treatment the same day he spoke to Defendant Hanson (*Id.*). Plaintiff does not know if Defendant Hanson has any medical training (*Id.*). Defendant Hanson is not a medical provider and does not provide ordinary medical treatment to offenders housed at Lawrence (Doc. 161-6, p. 12).

During the relevant times, Defendant McCarthy was a correctional lieutenant at Lawrence (Doc. 161-1, p. 51) (Doc. 161-7, p. 3). Plaintiff testified he told Defendant McCarthy about his wound but Defendant McCarthy told Plaintiff it was getting better and that he was not a medical doctor (Doc. 161-1, p. 51-52). Plaintiff testified he told Defendant McCarthy he was unhappy with his medical treatment while he was in segregation (*Id.*). Plaintiff asked Defendant McCarthy to call the HCU (*Id.* at p. 52). Plaintiff cannot say how many times he spoke to Defendant McCarthy about his medical care or what he expected Defendant McCarthy to do in response (Doc. 161-1, p. 51). Plaintiff does not know if Defendant McCarthy has any medical training (*Id.* at p. 51).

Defendant McCarthy is not a medical professional and has only basic first aid and CPR training (Doc. 161-7, p. 14).

During the relevant times, Defendant McGrath was a correctional officer at Lawrence (Doc. 161-1, p. 49) (Doc. 161-8, p. 8). Plaintiff talked to Defendant McGrath after he thought his leg was infected, around the end of July 2017 (Doc. 161-1, p. 50). Plaintiff spoke to Defendant McGrath approximately three or four times concerning his medical treatment on one or two days (*Id.*). Plaintiff testified that he showed Defendant McGrath his leg and told Defendant McGrath his leg was "bad," he was in pain, and he had a fever (*Id.*).  At least one of those days was the same day Defendant Hanson took Plaintiff to the HCU for additional treatment (*Id.*). Plaintiff does not know if Defendant McGrath has any medical training (*Id.*). Defendant McGrath is trained in basic first aid every year at Lawrence (Doc. 161-8, p. 14). Plaintiff testified nurses make rounds in segregation housing and if an offender has an issue with his medical treatment, the officer gets a nurse's attention to tell them about said issue (Doc. 161-1, p. 51).

During the relevant times, Defendant Thompson was a correctional officer at Lawrence (Doc. 161-1, p. 43) (Doc. 161-9, p. 4-5). Plaintiff alleges he spoke to Defendant Thompson regarding his leg injury on June 16, 2017, during the 3:00 p.m. to 11:00 p.m. shift (Doc. 161-1, p. 44). Plaintiff does not know if Defendant Thompson called the HCU regarding Plaintiff's injury after Plaintiff talked to him (*Id.*). Plaintiff does not know if Defendant Thompson has any medical training (*Id.*). Defendant Thompson testified that if an offender would have complained about a medical issue, he would have verified that he could see the injury and would have contacted a supervisor for direction (Doc. 161-9,

p. 8). Plaintiff stated there are multiple other ways to obtain medical attention outside of requesting attention from correctional staff (Doc. 161-1, p. 56).

### LEGAL STANDARDS

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

### DISCUSSION

The Supreme Court has recognized that deliberate indifference to the serious medical needs of prisoners may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a claim for deliberate indifference to a serious medical need, there are "two high hurdles, which

every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate he suffered from an objectively serious medical condition. *Id.* at 591-92. Second, the plaintiff must establish the individual prison officials were deliberately indifferent to that condition. *Id.*

A prison official exhibits deliberate indifference when they know a serious risk to the prisoner's health exists but they consciously disregard that risk. *Holloway*, 700 F.3d at 1073 (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)).

Here, no one disputes that Plaintiff suffered from an objectively serious medical condition.  However, Defendants argue they are entitled to summary judgment because there is no evidence they knew of a substantial risk of serious harm to Plaintiff or consciously disregarded that risk.

## I.    Defendant Ahmed

Plaintiff alleges Defendant Ahmed was deliberately indifferent to Plaintiff's serious medical needs because Defendant Ahmed did not suture Plaintiff's wound, nurses did not follow Defendant Ahmed's orders to change Plaintiff's bandages daily, and Defendant Ahmed did not order the nurses to change Plaintiff's bandages.

The parties agree that Plaintiff sustained the wound to his right leg on June 16, 2017, around 9:00 p.m. to 9:30 p.m. (Doc. 167-2, p. 8) (Doc. 163-3) and that Plaintiff did

not receive treatment from the Health Care Unit until approximately 24 hours later, on June 17, 2017, at 9:40 p.m. (Doc. 167-4, p. 98-99). It is also undisputed that Defendant Ahmed first treated Plaintiff's wound on June 19, 2017, and again on July 14, July 27, and August 2, 2017 (Doc. 167-2, p. 10, 18, 24, & 28)[2]

Defendant Ahmed testified that in his medical opinion, if more than six hours passes between a wound occurring and receiving medical treatment, it is generally too late to stitch or suture the wound (Doc. 163-2, p. 23-24, 39-40, & 41). For this reason, Defendant Ahmed did not suture or stitch Plaintiff's wound when he initially examined Plaintiff on June 19, 2017 (Doc. 163-2, p. 23-24). Instead, Defendant Ahmed continued the treatment plan to clean the wound (*Id.* at p. 23-24 & 29-33). Defendant Ahmed prescribed Plaintiff the antibiotic Amoxicillin, ordered nurses to change Plaintiff's wound and dressing daily with triple antibiotic ointment, and ordered a wound culture (*Id.* at p. 29-33) (Doc. 163-6, p. 4). On June 23, 2017, Defendant Ahmed reviewed the lab results of Plaintiff's wound culture from June 19 and the culture was negative for infection (Doc. 167-2, p. 119).

Defendant Ahmed treated Plaintiff an additional three times. On July 14, 2017, Defendant Ahmed noted the area of Plaintiff's wound was tender but healing (Doc. 163-2, p. 71-73) (Doc. 167-2, p. 18). Defendant Ahmed ordered that Plaintiff be issued triple

---

[2] Plaintiff's Second Amended Complaint suggests Defendant Ahmed treated Plaintiff on June 16, 2017 (Doc. 27, p. 11, ¶ 20). However, Plaintiff abandons this argument in his response to Defendant Ahmed's summary judgment motion and states Defendant Ahmed first treated Plaintiff for his leg wound on June 19, 2017 (Doc. 167, p. 12). However, whether Defendant Ahmed initially treated Plaintiff on June 16 or June 19, 2017 has no bearing on the deliberate indifference analysis. Either medical visit occurred after six hours from when Plaintiff sustained the wound, which according to Defendant Ahmed's professional judgment, was too long to suture or stitch the wound.

antibiotic ointment and Band-Aids and educated Plaintiff on wound care (Doc. 163-2, p. 44-45) (Doc. 167-2, p. 114).

Defendant Ahmed treated Plaintiff on July 27, 2017 and he assessed Plaintiff with cellulitis (Doc. 167-2, p. 24). Defendant Ahmed prescribed Plaintiff Clindamycin, which is used to treat MRSA, ordered a culture and blood laboratory tests, and again ordered nurses to change Plaintiff's dressing every day (Doc. 163-6, p. 18-19, 36, & 38-40).

The HCU determined Plaintiff's culture was positive for MRSA on July 30, 2017 (Doc. 163-6, p. 20-21 & 38-39). Defendant Ahmed saw Plaintiff on August 2, 2017 and observed Plaintiff's wound was healing, there was granulation, and there was no redness or discharge (Doc. 163-2, p. 57-59) (Doc. 163-6, p. 22). Defendant Ahmed discontinued the Clindamycin because the leg was healing, there were no signs of infection, and he wanted Plaintiff to avoid side effects from the antibiotic (Doc. 163-2, p. 58-59) (Doc. 167-2, p. 24-25, 115, & 120-22). Plaintiff testified his wound healed around August 2, 2017 and did not require any additional treatment (Doc. 163-1, p. 138-39).

To the extent Plaintiff disagrees with Defendant Ahmed's decision not to suture the wound or to pursue the course of treatment that he did, the constitution does not entitle a prisoner to "demand specific care" or to receive the "best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). "Neither medical malpractice nor a mere disagreement with a doctor's medical judgment amounts to deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (internal citations, alterations, and quotations omitted). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment cannot support a deliberate indifference

claim unless there is evidence the defendant "knew better than to make the medical decision" he made. *Id.* at 662-63. Sufficient evidence to support this inference may include "the obviousness of the risk from a particular course of treatment, the defendant's persistence in a course of treatment known to be ineffective, or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* at 663 (internal citations and quotations omitted).

Here, there is no inference that Defendant Ahmed "knew better" than to pursue the course of treatment that Plaintiff contends was unconstitutional. Defendant Ahmed explained at his deposition that he does not stitch a laceration if more than six hours has passed and instead treats the wound with saline and a dressing with an antibiotic (Doc. 163-2, p. 24). He also takes a culture to determine if there is an infection to assess if oral antibiotics are appropriate, which is how he treated Plaintiff here (*Id.*). Plaintiff has not pointed out any medical standard that Defendant Ahmed violated by not suturing the wound or by pursuing the course of treatment that he did. Further, no expert testified that Defendant Ahmed's chosen course of treatment was a substantial departure from accepted medical judgment, and the decision was not so obviously wrong that a layperson could draw the inference without an expert. *See Owens v. Duncan*, 788 F. App'x 371, 375 (7th Cir. 2019) (affirming dismissal of a deliberate indifference claim because the defendant's decision to let the plaintiff's incision heal naturally instead of stitching it was insufficient to support any inference of an improper motive); *Reaves v. Riggs*, 2020 WL 6689109, at *8 (S.D. Ind. Sept. 30, 2020) (granting summary judgment on a plaintiff's

deliberate indifference claim based on a nurse's decision to provide the plaintiff with supplies to change his wound dressing rather than order medical staff to change the dressing daily).

Also, there is no evidence that Defendant Ahmed persisted in a course of treatment he knew was ineffective. According to the undisputed evidence, Defendant Ahmed first noted an infection on July 27, 2017 and he immediately modified Plaintiff's treatment plan and ordered laboratory tests. When Defendant Ahmed saw Plaintiff around a week later, on August 2, 2017, Plaintiff's wound was healing. The wound did not require any further treatment.

No reasonable jury could determine Defendant Ahmed was deliberately indifferent in his treatment of Plaintiff's laceration. Plaintiff merely disagrees with Defendant Ahmed's medical judgment and is dissatisfied he did not receive specific care or the best care possible. But none of these complaints are sufficient to sustain a claim for deliberate indifference.

Further, Plaintiff contends Defendant Ahmed was deliberately indifferent because he ignored Plaintiff's complaints that nurses at Lawrence were not cleaning his wounds and dressings every day. Individual liability under § 1983 requires personal involvement in the alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). However, "a defendant's direct participation in the deprivation is not required." *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000). "An official satisfies the personal responsibility requirement of § 1983 if she acts or *fails to act* with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Id.* (emphasis in original)

(internal citations and quotations omitted). Thus, a defendant may be held liable under §

1983 if he knows about a plaintiff's medical condition and does not intervene to remedy

the condition. *See Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017); *Perez v. Fenoglio*, 792

F.3d 768, 781-82 (7th Cir. 2015).

Here, there is no evidence Defendant Ahmed received, reviewed, or was aware of

any of Plaintiff's grievances or complaints concerning his wound treatment or otherwise

knew that nurses were not following instructions. Defendant Ahmed testified that, to his

knowledge, the nurses were following his orders throughout Plaintiff's treatment (Doc.

163-2, p. 82-83). Because there is no evidence Defendant Ahmed knew of Plaintiff's

complaints concerning his medical care, Defendant Ahmed could not have recklessly

disregarded those complaints. Defendant Ahmed is entitled to summary judgment. *See*

*Bans v. Patton*, 2019 WL 189243, at *6 (E.D. Wis. Jan. 14, 2019) (nurse practitioner entitled

to summary judgment on deliberate indifference claim where she had no knowledge the

jail staff failed to follow her orders to change the plaintiff's bandage daily).

## II.    Defendants Cunningham, Goodrum, Hanson, McCarthy, McGrath, and Thompson

Defendants Cunningham, Goodrum, Hanson, McCarthy, McGrath, and

Thompson argue they are entitled to summary judgment because they were not

personally involved in providing Plaintiff medical treatment. During the relevant times,

Defendants Goodrum, McCarthy, Hanson, and McGrath were correctional officers,

sergeants, or lieutenants at Lawrence. Defendant Cunningham was the Health Care Unit

Administrator and Defendant McFarland was the Director of Nursing. None of these

defendants provided direct medical care to Plaintiff.[3]

If a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. *Arnett*, 658 F.3d at 755. However, non-medical officials can be held liable for deliberate indifference where they have a reason to believe or actual knowledge that prison doctors or their assistants are mistreating or not treating a prisoner. *Id.* "Non-medical defendants cannot simply ignore an inmate's plight." *Id.* However, a plaintiff must demonstrate that he gave the non-medical defendant "sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Id.* (internal quotations and citations omitted).

### A. Defendant McFarland

Defendant McFarland was the Director of Nursing who was in charge of Lawrence's nursing staff during June, July, and August, 2017 (Doc. 167-10, p. 5). As the Director of Nursing, Defendant McFarland would not have been involved in Plaintiff's treatment unless a complaint was made about his medical care (Doc. 159-3, p. 17-18). Defendant Ahmed testified he did not speak with Defendant McFarland about Plaintiff's treatment because treatment was going well (*Id.*).

---

[3] Plaintiff's testimony suggests that Defendants Cunningham and McFarland were involved in the decision not to suture his wound on June 17, 2017 (Doc. 163-1, p. 109, 182, & 219). Defendants dispute this. Although the Court views the record in the light most favorable to the non-movant on summary judgment, Plaintiff does not reference Defendant Cunningham or Defendant McFarland's alleged treatment, argue that their treatment was deliberately indifferent, or otherwise pursue this theory in his opposition to the summary judgment motions. Arguments not properly developed in a response to a summary judgment motion are waived. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 528 (7th Cir. 2005); *see also Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 26 F.3d 742, 746 (7th Cir. 2001) ("acquiescence" in response to an argument "operates as a waiver"). Further, even if Defendant Cunningham and Defendant McFarland provided input on the decision not to stitch or suture Plaintiff's wound on June 17, 2017, there is no evidence that the treatment was deliberately indifferent.

On August 15, 2017, Plaintiff filed a grievance that states, in relevant part:

> it took all the way to the date 7, 23, 17 that my right leg had got real bad with a[] staff infection from staff in Lawrence not car[]ing when I/M Ricky Cruz kept alerting officers nurs[es] director of nurs[e]s Laura Cunni[n]gham Mark Mcfarland that run medical. I even let the warden know about it warden Lamb. The staff here took so much time to get on to what needed to be done that I had got very sick and had a very bad infection in my leg. . .

(Doc. 161-3, p. 70-71) (errors in original).

Although Plaintiff states he "kept alerting" Defendant McFarland, there is no evidence of what he alerted McFarland about or of the timing or substance of his complaints. Neither the grievance, Plaintiff's deposition testimony, nor any other evidence identifies the details of Plaintiff's complaints to Defendant McFarland. Thus, no reasonable jury could conclude that Plaintiff's communications put Defendant McFarland on notice of an excessive risk to Plaintiff's health. *See Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996) (affirming summary judgment for prison warden where the inmate argued she sent letters describing inadequate medical care but did "not supply, in her description of the purported letters, any detail to permit the conclusion that the letters sufficiently advised the warden of the situation to require her intervention").

Plaintiff relies on deposition testimony that he complained to nurses that his leg was not healing (Doc. 167, p. 12) (citing Doc. 167-4, p. 199), and points out that Defendant McFarland supervised those nurses (Doc. 167, p. 13). However, there is no evidence Defendant McFarland knew the nurses were not following orders. Defendant McFarland cannot be held vicariously liable for the actions of nurses under his supervision. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Even if Defendant McFarland was negligent in

supervising the nurses, "[s]upervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Chavez v. Illinois States Police*, 251 F.3d 612, 651 (7th Cir. 2001) (internal citations, quotations, and alterations omitted). Because Plaintiff has no evidence of Defendant McFarland's involvement in the alleged constitutional violation, his claim against Defendant McFarland fails as a matter of law.

### B. Defendant Cunningham

Defendant Cunningham reviewed and responded to inmate grievances related to medical needs during the relevant times (Doc. 167-11, p. 12-15). She provided input on grievance responses and spoke to medical professionals whose conduct was at issue in grievances (*Id.*).

On July 1, 2017, Plaintiff filed a grievance that states a physician ordered that he receive bandage changes and wound cleaning every day, beginning on June 17, 2017 (Doc. 167-9, p. 4-5). Plaintiff complained that nurses were not treating him at all or were only cleaning the wound with water (*Id.* at p. 5). The grievance states that on July 1, 2017, a nurse eventually tended to Plaintiff's wound (*Id.*). The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 4). A grievance counselor responded on August 8, 2017 and stated, "addressed by 7-10-17 grievance" (*Id.* at p. 5)

On July 2, 2017, Plaintiff filed another grievance that states a nurse looked at his wound and gave him a bandage but did not clean it or apply antibiotic ointment (*Id.* at p. 6). The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.*). A

grievance counselor responded on August 8, 2017 and stated, "addressed by 7-10-17 grievance" (*Id.*).

On July 3, 2017, Plaintiff filed a grievance that states he had not been seen by a nurse for his leg wound on that date and needed the wound cleaned and bandaged (Doc. 161-3, p. 85). The grievance indicates it was received by the Administrative Review Board ("ARB"), which responded that the grievance was misdirected because medical issues must be reviewed at the facility prior to review by the ARB (*Id.* at p. 84).

On July 10, 2017, Plaintiff file a grievance about his medical treatment (Doc. 167-9, p. 2-3). The grievance states Plaintiff's wound was open and he did not have bandages to dress the wound (*Id.*). Further, the wound was turning green and Plaintiff believed it was infected (*Id.*). The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 2). On July 17, a grievance counselor responded, "Per HCU as documented in medical chart Offender Cruz is being seen and treated by a licensed Illinois physician within community standards of care" (*Id.*). Defendant Cunningham indicated she was the individual from the HCU who reviewed Plaintiff's medical chart and responded to the grievance counselor (Doc. 161-4, p. 15-16).

Plaintiff filed another grievance on August 15, 2017, which states, in part:

> it took all the way to the date 7, 23, 17 that my right leg had got real bad with a[] staff infection from staff in Lawrence not car[]ing when I/M Ricky Cruz kept alerting officers nurs[es] director of nurs[e]s Laura Cunni[n]gham Mark Mcfarland that run medical. I even let the warden know about it warden Lamb. The staff here took so much time to get on to what needed to be done that I had got very sick and had a very bad infection in my leg. . .

(Doc. 161-3, p. 70-71).

The grievance is stamped "RECEIVED" by the grievance office at Lawrence (*Id.* at p. 70). A grievance counselor responded to the grievance on August 18 and wrote, "Per HCUA, Ms. Cunningham, 'As documented in medical chart, Offender Cruz being seen and treated by licensed Illinois physician within community standards of care.'" (*Id.* at p. 69). Plaintiff appealed the grievance to the ARB and the ARB emailed Defendant Cunningham about Plaintiff's treatment on November 6, 2017 (*Id.* at p. 68). Defendant Cunningham responded on November 7, 2017 with a summary of Plaintiff's medical care (*Id.* at p. 67-68). The summary states Plaintiff was treated by either a nurse or a physician on June 17, June 18, June 19, June 21, June 22, June 24, June 25, June 28, July 2, July 6, July 7, July 12, July 13, July 14, July 18, July 24, July 26, July 27, July 28, July 29, July 30, July 31, August 2, August 5, August 6, August 7, August 8, August 10, August 11, August 12, August 13, and August 14 (*Id.*). The summary also states that on August 15, the right leg wound healed (*Id.* at p. 67).

In addition to these grievances, Plaintiff testified he sent one or two letters directly to Defendant Cunningham in which he was "letting her know about certain things…going on with Medical" (Doc. 163-1, p. 183-85). The letters are not in the record and Plaintiff did not testify as to any more details about the letters (*See Id.*).

Although Defendant Cunningham was the Health Care Unit Administrator during the relevant times, she was not involved in Plaintiff's medical treatment and was therefore entitled to rely on the judgment of medical professionals. *Arnett*, 658 F.3d at 755. However, Defendant Cunningham can still "be chargeable with deliberate indifference" if she had a reason to believe or actual knowledge that the medical

professionals were mistreating Plaintiff.  *Id.* (internal citations, quotations, and alterations omitted).

As an initial matter, Plaintiff testified he sent letters to Defendant Cunningham and in his August 15, 2017 grievance, Plaintiff states he "kept alerting" Defendant Cunningham. However, Plaintiff makes no argument that Defendant Cunningham was deliberately indifferent to his complaints outside of her responses to the grievances she reviewed. Aside from these grievances, Plaintiff does not set out any evidence of how or when he otherwise alerted Defendant Cunningham about his medical care, or what the substance of his complaints were. "The plaintiff must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Arnett*, 658 F.3d at 755 (7th Cir. 2011) (internal quotations and citations omitted).

However, Plaintiff's grievances specifically state he was prescribed daily wound care but that nurses were not following physician orders, which led to an infection. The grievances also state Plaintiff did not have bandages to dress his own wound. Defendant Cunningham testified she reviewed inmate grievances during the relevant time and provided input into grievance responses. Further, when a medical professional's conduct was placed at issue in a grievance, she could speak to the nurse or physician about the complaint. Defendant Cunningham does not dispute that she received Plaintiff's grievances. These grievances support an inference that Defendant Cunningham knew Plaintiff was not receiving adequate care. While Defendant Cunningham may have been able to rely on the judgment of medical professionals, that relevant judgment had already

been made. Plaintiff's physicians prescribed daily wound care from nurses from June 17, 2017 to July 14, 2017. Plaintiff was prescribed bandages and ointments between July 14, 2017 and July 27, 2017. Again, on July 27, 2017, Plaintiff was prescribed daily wound care from nurses. According to Plaintiff's grievances, which Defendant Cunningham reviewed, Plaintiff was not receiving the prescribed care.  At some point during July, while Plaintiff complained about his medical treatment, the wound became infected. Accordingly, the record contains issues of disputed material facts that a jury must decide as to whether Defendant Cunningham was deliberately indifferent to Plaintiff's medical needs.

### C.  Defendant Hanson

Plaintiff spoke to Defendant Hanson two times regarding his medical treatment (Doc. 163-1, p. 192). Both conversations occurred on the same day (*Id.*). Plaintiff received medical treatment approximately ten to fifteen minutes after Plaintiff's second conversation with Defendant Hanson (*Id.* at p. 190-91). Also, medical records state that on July 26, 2017, Defendant Hanson stopped a nurse while she was conducting a medical line and asked her to see Plaintiff about his leg wound (Doc. 167-2, p. 23). The note states Plaintiff was already scheduled to see a medical provider the next day, July 27, 2017 (*Id.*). Plaintiff testified his complaints against Defendant Hanson are based on his belief that Defendant Hanson was disrespectful to Plaintiff when Plaintiff complained about his medical treatment (Doc. 161-1, p. 192-93).

The evidence related to Defendant Hanson does not raise any inference that he was deliberately indifferent. When Plaintiff lodged complaints about his treatment with

Defendant Hanson, Plaintiff received medical attention shortly after or Defendant Hanson verified with a nurse that Plaintiff was under the care of a medical provider. Nothing suggests Defendant Hanson approved of or turned a blind eye to Plaintiff's serious medical needs. Defendants Hanson is entitled to summary judgment. *See Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005) ("[W]e can see no deliberate indifference given that [the non-medical defendant] investigated the complaints and referred them to the medical providers who could be expected to address [the plaintiff's] concerns").

### D. Defendants McGrath, McCarthy, Goodrum, & Thompson

Defendant Thompson was the correctional officer on duty in the wing where Plaintiff's cell was located on June 16, 2017, the date Plaintiff suffered the laceration to his leg (Doc. 167-3, p. 3). Plaintiff testified he showed Defendant Thompson his injury and told him he needed medical attention (Doc. 161-1, p. 44). According to Plaintiff, Defendant Thompson said he would call the HCU, but never returned to help Plaintiff (*Id.*). Plaintiff does not know whether Defendant Thompson called the HCU (*Id.*). Another inmate, Gilberto Mojena, submitted an affidavit that states on June 16, 2017, he heard Plaintiff yelling to an officer that he needed medical treatment (Doc. 167-5). Mr. Mojena stated the officer told Plaintiff he would contact the HCU (*Id.*). Plaintiff did not receive medical attention until the following day (Doc. 167-2, p. 8-9). Defendant Thompson testified he would never ignore an inmate's complaint of suffering (Doc. 161-9, p. 8).

Plaintiff spoke to Defendant McGrath approximately three or four times about his medical treatment over the course of one or two days (Doc. 161-1, p. 50). The conversations occurred around the end of July, when Plaintiff's leg started getting

infected (*Id.*). Plaintiff showed Defendant McGrath his leg and told Defendant McGrath his leg was "bad," he was in pain, and he had a fever (*Id.*). On one of the days Plaintiff spoke to Defendant McGrath, Plaintiff was escorted to the HCU by another officer for treatment (Doc. 161-1, p. 194-95).

On July 10, 2017, Plaintiff filed a grievance that states on July 8, he showed Defendant McCarthy his leg wound and asked why it was turning green ((Doc. 167-9, p. 2-3). The grievance states Plaintiff told Defendant McCarthy he did not have any bandages and nurses were not treating him, which was contrary to his doctor's orders (*Id.*). According to the grievance, Plaintiff asked Defendant McCarthy if he would call HCU for treatment (*Id.*). Plaintiff's medical records indicate that the next time Plaintiff received a dressing change was on July 12, 2017.

Plaintiff stopped Defendant Goodrum during rounds on "a few" occasions and explained he was not receiving proper medical treatment for his wound (Doc. 161-1, p. 48). Plaintiff asked Defendant Goodrum to call someone to arrange treatment (*Id*). Defendant Goodrum told Plaintiff he would call the HCU (*Id.*).

On August 15, 2017, Plaintiff filed a grievance, which states:

the infection was causing me so much pain I could[n't] walk caus[ing] me to have a temperature of 97 on 7/23/17 because of inadequate medical attention[.] [E]very time I told Officers Goodrum R/O McGrath R/O Johnson R/O Imboeen and Lts that work 8-B they told me after seeing this bad infection that they would phone[] medical and it took all the way for medical doctor Ahmed to properly wrap an clean the infected wound on 7,28,17 after [already] being infected with [illegible] also I had to walk on swollen painful right leg from dates to an[d] from chow and medical after staff seeing what they seen my leg is still seriously infected because of medical staff not doing the[i]r jobs. None of these officers or staff here at Lawrence [were] concerned when this infection had started to take affect[.]

(Doc. 161-3, p. 70-71).

The Court begins this analysis by noting that  many of the arguments set out by Defendants Thompson, McGrath, Goodrum, and McCarthy are undeveloped and lack citations to any authority. For instance, Defendants state "there are multiple other ways to obtain medical attention, outside of requesting attention from correctional staff" (Doc. 161, p. 17). Also, Defendants point out that Plaintiff wrapped his leg and fell asleep on the night he sustained his injury, which shows the injury "was not so severe that he needed immediate medical attention" (*Id.* at p. 18). Defendants' skeletal assertions are insufficient and the Court has "no duty to research and construct legal arguments available to a party." *Kossman v. Northeast Illinois Regional Commuter R.R. Corp.*, 211 F.3d 1031, 1038 (7th Cir. 2000) (internal citations and quotations omitted); *see also Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things.") (emphasis in original). Accordingly, Defendants' undeveloped arguments are waived and will not be addressed. *United States v. Lanzotti*, 205 F.3d 951, 957 (7th Cir.2000) ("We repeatedly have made clear that perfunctory and underdeveloped arguments and arguments that are unsupported by pertinent authority, are waived.").

When viewing the record in the light most favorable to Plaintiff, Defendants Thompson, McGrath, Goodrum, and McCarthy saw Plaintiff's wound and were notified Plaintiff was in pain and not receiving proper medical attention. "If a prisoner is writhing in agony, the guard cannot ignore him on the ground of not being a doctor; he has to

make an effort to find a doctor[.]" *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 941 (7th Cir. 2015). Nothing in the record suggests these defendants did anything to confirm that Plaintiff was actually receiving medical treatment, deferred to the judgment of a medical official, or acted on Plaintiff's complaints in any way. *Cf. Greeno*, 414 F.3d at 655-56 (finding a non-medical official was not deliberately indifferent where he reviewed the plaintiff's complaints and verified with medical officials that the plaintiff was receiving treatment but noting, "perhaps it would be a different matter if [the defendant] had ignored [the plaintiff's] complaints entirely"). Defendants argue that "defendants who worked in [Plaintiff's] housing unit would have been aware that he was consistently being treated by health care unit staff" (Doc. 161, p. 17). However, again here, Defendants do not cite to *any evidence* to show the Court that Defendants were aware of Plaintiff's medical care and the Court is not obligated to scour the record for such evidence, if it exists. *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) (stating the court "will not scour a record to locate evidence supporting a party's legal argument.").

Defendants Thompson, McGrath, Goodrum, and McCarthy argue Plaintiff's claim still fails because there is no evidence their inaction caused his infection. Common sense dictates that wounds must be kept clean to prevent or treat infections, and that regular bandage changes and care would help keep a wound clean, especially in a prison environment. *See Banks v. Patton*, 2019 WL 189243, at *6 (E.D. Wis. Jan. 14, 2019). It is uncontested that Plaintiff's doctor prescribed him daily wound care from June 17, 2017 until July 14, 2017 and again, beginning on July 27, 2017. It is also undisputed that Plaintiff developed a MRSA infection at some point in July 2017, which is around the time Plaintiff

complained about his medical treatment to Defendants McGrath, Goodrum, and McCarthy. Plaintiff is not required to definitively prove his case at the summary judgment stage. It is enough that he raises a genuine issue of fact as to whether Defendants' inaction caused him an injury.

Further, Plaintiff testified he experienced pain and suffering as a result of the delay in medical attention when he incurred the laceration and when the wound became infected. A delay in treating painful conditions may constitute deliberate indifference if the delay unnecessarily prolonged an inmate's pain. *Arnett*, 658 F.3d at 753. Even short delays caused by the inaction of Defendants Thompson, McGrath, Goodrum, and McCarthy can support a deliberate indifference claim. *See Lewis v. McLean*, 864 F.3d 556 (7th Cir. 2017) (one-and-a-half hours delay in assisting an inmate with severe and immobilizing back pain sufficient to overcome summary judgment); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (failure to treat a broken nose for a day and a half sufficient to withstand summary judgment); *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996) (finding that the question of whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after a "beating" was "an issue for the jury"); *Smith v. Knox County Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) ("Even a few days' delay in addressing a severely painful but readily treasonable condition suffices to state a claim of deliberate indifference"). With respect to Defendant Thompson, specifically, a reasonable jury could find his delay in assisting Plaintiff on June 16, 2017, prevented Plaintiff's physicians from suturing his wound, which led to the MRSA infection. *See Perez*, 792 F.3d at 781 (finding the plaintiff stated a deliberate indifference claim against a

prison administer who's delay in approving medical treatment allegedly resulted in a physician not being able to suture the plaintiff's wound). Defendants do not point the Court to any authority that the delay in Plaintiff's medical treatment attributable to Defendants Thompson, Goodrum, McGrath, and McCarthy is insufficient to support a deliberate indifference claim as a matter of law.

Also, Defendant Thompson argues the wing check logbook for the evening shift on June 16, 2017 does not indicate there were any issues. He also points out that Mr. Mojena's affidavit references the receiving officer (not the wing officer) as the individual from whom Plaintiff requested medical attention. Thus, according to Defendant Thompson, a reasonable jury could find Plaintiff was not requesting medical attention from him on June 16, 2017. "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for the factfinder." *Johnson v. Advocate Health and Hospitals Corporation*, 892 F.3d 887, 893 (7th Cir. 2018). Defendant Thompson's assertion that a reasonable jury could find in his favor is insufficient to establish that he is entitled to judgment at this stage. The question is whether no reasonable jury could find for Plaintiff. *See Id*. Here, Plaintiff testified he spoke to Defendant Thompson and there is evidence Defendant Thompson was on duty and assigned to Plaintiff's wing on the night in question. Thus, there is a genuine dispute of fact that precludes summary judgment on this basis.

In sum, the record contains evidence from which a reasonable jury could infer that Defendants Thompson, McGrath, Goodrum, and McCarthy were sufficiently aware of Plaintiff's complaints about inadequate medical treatment and that they ignored

Plaintiff's complaints entirely.

### III.    Qualified Immunity

Defendants Cunningham, Goodrum, Hanson, McCarthy, and McGrath argue they are entitled to summary judgment on the affirmative defense of qualified immunity. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statuary or constitutional rights of which a reasonable person would have known." *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 20140 (internal quotations and citations omitted). The qualified immunity analysis involves two inquiries: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Id.* at 537. "If *either* inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Id.* (emphasis in original).

Here, aside from citing the qualified immunity standard, Defendants' argument consists of the following:

> Under the first prong of the analysis, the facts alleged here do not give rise to a Constitutional violation. As analyzed in the preceding sections, Plaintiff cannot establish Defendants violated his Eighth Amendment rights. Under the second prong of the analysis, the Defendants are also entitled to qualified immunity because if they were to be held liable on the facts alleged, it would constitute a heightened standard for what constitutes an Eighth Amendment claim. Therefore, the defendants are entitled to qualified immunity.

(Doc. 161, p. 19).

Defendants do not provide any legal analysis on the qualified immunity issue or

cite any authority to support the defense. Again, it is not the Court's role to research and raise legal arguments for a party. "It has long been clear that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment." *Lewis*, 864 F.3d at 566. In *Lewis*, the Seventh Circuit rejected a qualified immunity defense on summary judgment where a prisoner plaintiff complained of severe back pain to the correctional personnel defendants, but they refused to escort him to the infirmary unless he would stand to be cuffed. *Id.* The inmate told them he was unable to move because of the pain and the defendants refused to take him to the infirmary. *Id.* An hour-and-a-half after the inmate initially requested help, one of the defendants contacted the on-call physician, who directed the inmate be taken to the hospital. *Id.* at 560. The Seventh Circuit found the deliberate indifference claim against the defendants survived summary judgment because a reasonable jury could find the delay in treatment for one-and-a-half hours caused the inmate unnecessary suffering. *Id.* at 563-64. The Court also found the defendants were not entitled to qualified immunity because the delay in assisting the inmate "ran afoul" of the inmate's clearly established rights under the Eighth Amendment. *Id.* at 566. Here, as noted in *Lewis*, it has long been clearly established that correctional personnel could not ignore an inmate's serious medical needs. Accordingly, Defendants are not entitled to qualified immunity.

<u>CONCLUSION</u>

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant Mark McFarland (Doc. 158) is **GRANTED**. The Motion for Summary Judgment filed by Lorie Cunningham, Trevor Goodrum, James Hanson, Leif McCarthy, John McGrath, and

Nolan Thompson (Doc. 160) is **GRANTED, in part**, as to Defendant James Hanson, and **DENIED, in part**, as to Defendants Lorie Cunningham, Trevor Goodrum, Leif McCarthy, John McGrath, and Nolan Thompson. The Motion for Summary Judgment filed by Defendant Faiyaz Ahmed (Doc. 162) is **GRANTED**. Judgment will be entered in favor of Defendants McFarland, Hanson, and Ahmed at the conclusion of this case.

**IT IS SO ORDERED.**

**DATED: May 17, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**